IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Tyler Frank,                                         Case No. 3:06 CV 1442

                              Plaintiff,             MEMORANDUM OPINION
                                                     AND ORDER

             -vs-
                                                     JUDGE JACK ZOUHARY
University of Toledo

                              Defendant.


I.     BACKGROUND

       A.      Plaintiff's Study at University of Toledo

       In January 1998, Plaintiff Tyler Frank enrolled in Defendant University of Toledo's Ph.D.

program.  Plaintiff is a disabled veteran who uses a cane and has nerve problems in one hand that

cause him to tire after a period of typing.  In June 2000, Plaintiff had an "in-take assessment" with

Defendant's Office of Accessibility to determine what accommodations he may need while pursuing

his degree.  After this meeting, Defendant determined Plaintiff should have parking accommodations

as well as access to adaptive technology that could increase his typing ability and speed.  Plaintiff

passed his minor comprehensive exam, without any accommodations, and completed coursework with

the goal of taking the comprehensive exam, the last requirement before he could begin formal work

on his dissertation.

       In April 2001, Plaintiff took the comprehensive exam, again without any accommodations.

The grading committee informed Plaintiff he had failed.  Plaintiff did not request specific

accommodations before taking the exam (although he states he met with Defendant to discuss

accommodations "generally") and made no complaints until after finding out he had failed.  Plaintiff

then worked with Defendant to negotiate accommodations based on his disability, most specifically, his inability to type at a high speed and for a sustained period.

Initially, Plaintiff asked to re-write portions of his exam to bring them up to standard, but Defendant refused, citing the overall poor quality of the exam. Defendant offered accommodations such as extended time, "adaptive" software to enhance Plaintiff's typing speed and use of a scribe. On each occasion he was scheduled to retake the exam, Plaintiff declined to take the exam, claiming the accommodations were either inadequate or Defendant failed to provide all the accommodations it had agreed to offer. During this period, Plaintiff also lodged internal complaints about his treatment, one of which resulted in an investigation and re-grading of his April 2001 exam. The committee that re-graded the exam affirmed the original failing grade. Eventually Plaintiff's enrollment at the University lapsed because he neither completed the exam nor enrolled in coursework.

### B.      Plaintiff's Employment at Northern Michigan University

While he was trying to arrange accommodations for his comprehensive exam, Plaintiff began employment as an instructor with Northern Michigan University (NMU) in its College of Business. The job listing required either a Ph.D. or "ABD" ("all but dissertation"), which implies completion of the comprehensive exam. Plaintiff informed NMU at his hiring, and at various times during his employment, that he was working on his dissertation at the University of Toledo. However, it was impossible for Plaintiff to work formally on his dissertation or to have a topic approved until he passed the comprehensive exam. In February 2004, prompted by concerns over Plaintiff's poor teaching and his lack of progress on his dissertation, an NMU official, Dr. Sklar, called Dr. Doll, director of the Ph.D program at the University of Toledo, to ask about Plaintiff's status. Doll reported

2

Plaintiff had not completed his comprehensive exam and therefore was not yet in the dissertation stage. This disclosure, Doll later learned, was against the University's internal policy relating to disclosure of student information. Based on Plaintiff's negative teaching reviews and NMU's dissatisfaction with Plaintiff's progress toward his Ph.D, NMU terminated Plaintiff's employment.

## II.    JURISDICTION AND THRESHOLD ISSUES

Plaintiff alleges a variety of claims in Eleven Counts in his Amended Complaint (Doc. No. 41). Defendant moves for summary judgment on each count (Doc. No. 46).

Defendant has raised three threshold issues that it claims precludes the Court from considering the merits of Plaintiff's claims. Defendant argues: (1) the Court lacks subject matter jurisdiction over Plaintiff's state-law claims because Defendant enjoys sovereign immunity under the Eleventh Amendment; (2) the Court lacks subject matter jurisdiction over Plaintiff's claims arising under the Americans with Disabilities Act (ADA) because Congress has not abrogated state sovereign immunity under Title II of the ADA; and (3) the Court should dismiss Plaintiff's claims under the ADA and Rehabilitation Act as time-barred because Plaintiff did not file the Complaint within the statute of limitations.

### A.    Subject Matter Jurisdiction Over State-Law Claims

The State of Ohio enjoys sovereign immunity under the Eleventh Amendment. A state retains this immunity unless it consents to being sued. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996) ("[E]ach State is a sovereign entity in our federal system; and . . . [i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent ") (second alteration in original) (citations and internal quotation marks omitted). A federal court's supplemental jurisdiction under 28 U.S.C. § 1367(a) does not override this principle. *Raygor v. Univ.*

*of Minn.*, 534 U.S. 543, 541 (2002) (statute does not "authorize district courts to exercise jurisdiction over claims against nonconsenting States").

The Eleventh Amendment defense of sovereign immunity may be waived by consent in three ways:

> "[W]hile the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power," the defense "is not coextensive with the limitations on judicial power in Article III." *Calderon v. Ashmus*, 523 U.S. 740, 745 n. 2, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998). Unlike subject-matter jurisdiction, a State may waive Eleventh Amendment immunity through its own conduct: by legislation, *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990); by removing an action to federal court, *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 616, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002); or by "appearing without objection and defending on the merits," *Ku v. Tennessee*, 322 F.3d 431, 435 (6th Cir. 2003).

*Nair v. Oakland County Cmty. Mental Health Auth.*, 443 F.3d 469, 474 (6th Cir. 2006) (citation omitted).

The parties in the instant case do not dispute Defendant is entitled to immunity to the same extent as the State of Ohio. Ohio has not waived its immunity by legislation. The Sixth Circuit has held that Ohio's limited consent to be sued in the Ohio Court of Claims does not constitute a waiver of immunity in federal court. *Mixon v. State of Ohio*, 193 F.3d 389, 397 (6th Cir. 1999). The only possible basis for consent to the Court's jurisdiction in this case is the University's defense of this lawsuit in federal court.

The Sixth Circuit has not spoken with a single voice on whether a federal court may consider the merits of a state law claim before reaching the Eleventh Amendment issue. *Nair*, 443 F.3d at 475-76 (collecting and discussing Sixth Circuit cases that reach conflicting conclusions on power of federal courts to consider merits before reaching Eleventh Amendment defense). *Nair* concluded:

"We leave for another day the question whether a federal court must decide the immunity question before the merits when a State raises it as a threshold defense." *Id.* at 477.

Although Defendant did not file a motion to dismiss, it did assert an affirmative defense of sovereign immunity in its Answer (¶¶ 16, 20). The Court concludes Defendant's sovereign immunity defense is both properly raised and persuasive. Nonetheless, the Court will address the merits of the state-law claims, as they provide an alternative ground for judgment in this case.

**B.     Abrogation of State Sovereign Immunity Under Title II of the ADA**

The question of the validity of Title II of the ADA as applied to state universities such as Defendant is one of first impression in the Sixth Circuit.

In a recent decision, the U.S. Supreme Court prescribed an approach to determine whether state sovereign immunity has been abrogated under Title II of the ADA. *United States v. Georgia*, 546 U.S. 151, 158-59 (2006). In *Georgia*, the Supreme Court instructed lower courts to evaluate the propriety of Title II claims independently of any constitutional violation. When considering conduct that violates Title II, but not the Constitution, a court should determine whether the "purported abrogation of sovereign immunity is nevertheless valid." *Id.* at 159.

Since the Supreme Court's ruling in *Georgia*, two circuits courts have weighed in favor of abrogation of state sovereign immunity with respect to public higher education. *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 254 (3d Cir. 2007); *Toledo v. Sanchez*, 454 F.3d 24 (1st Cir. 2006). This Court agrees with the analysis and reasoning of these circuit court opinions.[1]

---

[1]

The district court in *Doe v. Bd. of Trs. of Univ. of Ill.*, 492 F.Supp 2d 930, 939 (N.D. Ill. 2006), concluded there was no abrogation because secondary education is not a fundamental constitutional right. However, the *Lane* decision by the Supreme Court in 2004 (upholding Title II with respect to access to courthouses and judicial proceedings) did not depend solely on such access being a fundamental constitutional right, even though this fact affected the Court's weighing of the "congruent and proportional" test.

5

In *Toledo*, the court considered three factors described in *Tennessee v. Lane*, 541 U.S. 509, 522-31 (2004): (1) the constitutional right Congress sought to protect; (2) any history of constitutional violations justifying enactment of prophylactic legislation; and (3) whether the law is a congruent and proportional response to these violations. Under the first factor, *Toledo* determined that it should consider public education in general and not just public higher education, following the Supreme Court's approach in *Tennessee v. Lane*. Accordingly, the court found that Congress sought to protect both equal protection and due process rights of disabled students' access to public education. Under the second factor, the court surveyed court decisions documenting a pattern of violations of these rights in public education, and cited the enactment of the Rehabilitation Act in 1973 as evidence of a record of such violations by the states. Finally, the court found the law was congruent and proportional to a pattern of violations because Title II does not require wholesale changes in programs but instead calls for "reasonable" accommodations for disabled individuals. The burdens and costs Title II and its accompanying regulations place on defendants may be significant, but necessary in light of the historical problems associated with disabled students in public education. *See Toledo*, 45 F.3d at 39-40.

Guided by the Supreme Court holdings in *Georgia* and *Lane*, as well as these decisions of the First and Third Circuits, this Court concludes Congress validly abrogated state sovereign immunity with respect to public higher education.

### C.    Timeliness of Plaintiff's Claims under the ADA and Rehabilitation Act

#### 1.    Applicable Statute of Limitations

Another novel question before this Court is which statute of limitations should apply in adjudicating ADA/Rehabilitation Act claims. The ADA/Rehabilitation Act does not provide a statute

6

of limitations.  In *Wilson v. Garcia*, 471 U.S. 261 (1985), the U.S. Supreme Court held that courts should borrow the state's analogous statute of limitation if the federal statute does not provide one, so long as the application of state law is not inconsistent with the Constitution or laws of the United States.  *Wilson*, 471 U.S. at 267 ("When Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so.").  Ohio law offers two choices.  Under Ohio Revised Code §§ 4112.99 and 2305.07 (statute of limitations for liability created by statute), the limitation for failure to accommodate is six years.  Under Ohio Revised Code § 2305.10, actions for personal injury have a two-year limitation.

The majority of federal courts apply the state statute of limitations for personal injury.[2]  The Fourth Circuit is the only appellate court to vary, applying instead the limitation from a state discrimination statute.  In *Wolsky v. Med. Coll. of Hampton Rds.*, 1 F.3d 222, 225 (4th Cir. 1993) , the court diverged from these other holdings because it analogized ADA Title II claims to actions under the Virginia disability rights statute, which was modeled explicitly on federal statutes and contained its own statute of limitations.  *Wolsky* is the only decision to note a direct connection between the state and federal statutes, although other courts have considered analogous, albeit not necessarily identical, state statutes and have nonetheless deemed the personal injury statute of limitations most appropriate.  *See Morse v. Univ. of Vermont*, 973 F.3d 122, 125 (2d Cir. 1992)

---

[2] *Lewis v. Lafayette County Detention Ctr.*, No. 99-5538, 2000 WL 556132, at *2 (6th Cir.  Apr. 28, 2000); *Williams v. Trevecca Nazarene Coll.*, No. 97-5705, 1998 WL 553029, at *1 (6th Cir. Aug. 17, 1998); *Everett v. Cobb County School Dist.*, 138 F.3d 1407, 1409 (11th Cir. 1998); *Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 551 (7th Cir. 1996); *Baker v. Bd. of Regents of State of Kan.*, 991 F.2d 628, 631 (10th Cir. 1993); *Hickey v. Irving Indep. School Dist.*, 976 F.2d 980, 982 (5th Cir. 1992); Morse *v. Univ. of Vt.*, 973 F.2d 122, 126 (2d Cir. 1992).

(applying personal injury statute of limitations despite existence of Vermont disability and public accommodations statute).

The Sixth Circuit in *Lewis v. Fayette County Detention Ctr.*, No. 99-5538, 2000 WL 556132, at *2 (6th Cir. Apr. 28, 2000), in the context of alleged prisoner mistreatment and abuse, followed the majority reasoning and held that ADA/Rehabilitation claims are most analogous to personal injury claims. Earlier, in *Deck v. Toledo,* 56 F.Supp 2d 886 (N.D. Ohio 1999), the court applied a two-year statute of limitation to an action under the ADA, but that holding is arguably distinguishable from the present case on two grounds. At that time, (1) the disability statute provided a two-year period[3] and later, in 2001, the legislature amended that section to six years; and (2) the Ohio statute did not appear to cover the plaintiffs' complaint which dealt with sidewalk maintenance by the city. In the instant case, Ohio Revised Code § 4112.022 directly addresses accommodations by educational institutions.[4]

Following the revision of Ohio Revised Code § 4112.99, *Franklin v. Lucas County Children Svcs. Bd.*, No. 3:05 CV 7102, 2006 WL 561872 (N.D. Ohio March 6, 2006), maintained a two-year statute of limitations to a plaintiff's ADA Title II claim (citing *Deck* for support). And other Ohio courts have found the state disability statute comparable to the ADA/Rehabilitation Act and have accordingly applied the same analysis. *See City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St. 3d 569, 573 (1998) ("We can look to regulations and cases interpreting the federal Act for guidance in our interpretation of Ohio law."). Because the Ohio statute is not modeled directly on either of the federal acts, as was true in *Wolsky*, and because the instant action is analogous to a

---

[3]

Ohio Revised Code § 4112.99 (amended 2001): "A civil action commenced pursuant to this section shall be brought within two years after the alleged unlawful discriminatory practice occurred."

[4]

"It shall be an unlawful discriminatory practice for any educational institution to discriminate against any individual on account of any disability."

personal injury action, this Court adopts the majority viewpoint holding a two-year statute of limitations appropriate.

### 2.    Accrual of Action

Federal law governs the determination of accrual.  *Sevier v. Turner*, 742 F.2d 262, 272-73 (6th Cir. 1984).  This action accrued on April 3, 2001 when Plaintiff took, and was notified he failed, the comprehensive exam.  At that time, Plaintiff knew or had reason to know of the injury that is a basis for this lawsuit.  No later date appears appropriate.  This action was not filed until December 28, 2005.

This case is similar to *Soignier v. Am. Bd. Of Plastic Surgeons*, 92 F.3d 547, 552 (7th Cir. 1996), where the date of initial notification of denial of accommodations was the date of accrual, not the end of the "interactive process" of trying to determine applicable accommodations.  There, the court held the action accrued at the first exam where the plaintiff was not offered accommodations he had requested.  Likewise, in the instant case, Plaintiff claims he requested "reasonable accommodations" for the April 2001 exam; this, therefore, is the date of accrual.

Plaintiff argues each exam for which he did not receive satisfactory accommodations presents a new accrual, but cites no direct legal authority for this proposition.  Plaintiff also asks this Court to choose a later date based on two doctrines: (1) continuing violations; and (2) equitable tolling.  Neither doctrine applies here.

The continuing violations doctrine does not apply in the Title II disability context.  It has applied in the employment discrimination context, where it is limited to **current** violations or long-standing **policies** of discrimination.  *EEOC v. Penton Indus. Pub. Co.*, 851 F.2d 835, 838 (6th Cir. 1988).  *See also Ledbetter v. Goodyear*, 127 S. Ct. 2162 (2007), where the U.S. Supreme Court

rejected a similar argument where the original discriminatory action was a violation but subsequent non-discriminatory enforcement of the decision -- issuing paychecks -- was **not** a violation for statute of limitations purposes.  Here, Plaintiff does not argue the University is currently violating Title II or has a long-standing policy of discrimination.

Equitable tolling also does not apply here.  Plaintiff claims the action should be tolled because of his internal and external complaints.  Again, he cites no authority for this doctrine's application under Title II.  The Seventh Circuit has held internal grievances and other actions not required under Title II did not toll the statute of limitations.  *Soignier*, 92 F.3d at 553.  This Court concurs, and refuses to apply this doctrine beyond the Title VII context where plaintiffs are **required** to file complaints with the Equal Employment Opportunity Commission and thereby receive the benefit of equitable tolling.

The Court therefore concludes Plaintiff's claims under the ADA/Rehabilitation Act are time-barred under a two-year statute of limitations.

## III.  PLAINTIFF'S CLAIMS

The Court next addresses the merits of Plaintiff's claims, noting at the outset that Plaintiff has not opposed some of the grounds for dismissal raised by Defendant's Motion.  A plaintiff may not rest on the pleadings after a defendant has demonstrated an absence of a dispute of material fact, and failing to support such claims renders them abandoned.  *Nat'l Solid Wastes Mgmt. Ass'n v. Voinovich*, 959 F.2d 590, 592 (6th Cir.1992).  Accordingly, Plaintiff has abandoned certain claims by failing to address them in his Opposition.[5]

---

[5]

The Court finds Plaintiff has abandoned the following claims by failing to present supporting facts, or even to mention the claims, in his Opposition: (1) violation of privacy under Ohio common law in releasing Plaintiff's protected information to NMU (Count II of the Complaint); (2) promissory estoppel as a bar to

### A.    Summary Judgment Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Federal Civil Rule 56(c).  The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim.  *Id.* at 323-25.  Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (*quoting* Federal Civil Rule 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position.

---

Defendant's release of Plaintiff's protected information to NMU (Count III of the Complaint); (3) unlawful discrimination in violation of Ohio and federal law to the extent the Complaint alleged discrimination based solely on disability, as Plaintiff only advances failure to accommodate and unlawful retaliation based on his disability and asserts no claim of outright discrimination based on his disability (part of the claim in Count IV of the Complaint); (4) retaliation in violation of Ohio anti-discrimination law and the ADA, to the extent Plaintiff alleged Defendant violated these laws by "treating Plaintiff differently compared to similarly situated students with regard to the terms, conditions and benefits of enrollment" (part of the claims in Counts VI and VII of the Complaint); (5) negligence in releasing Plaintiff's protected information to NMU (Count XI of the Complaint).

11

*Celotex*, 477 U.S. at 324; *see also Harris v. Gen. Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  Ultimately, this Court must determine "whether [the evidence] is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

## 1.    Breach of Contract

Plaintiff alleges breach of contract on two grounds: his removal from the Ph.D program and the disclosure of his degree status information to NMU.

### *Removal from Program*

This Court recognizes that a student's enrollment in a university may create a contract under Ohio law.  *Bleicher v. Univ. of Cincinnati Coll. of Med.*, 78 Ohio App. 3d 302, 308 (1992) ("It is axiomatic that when a student enrolls in a college or university, pays his or her tuition and fees, and attends said school, the resulting relationship may reasonably be construed as being contractual in nature") (citation and internal quotation marks omitted).[6]

Plaintiff claims Defendant improperly removed him from the Ph.D. program in violation of the contract formed by enrollment.  Defendant argues Plaintiff was not "expelled" from the program

---

[6]

Plaintiff also alleges he enrolled and paid tuition to Defendant in reliance on its promise, as contained in its policies, that it would not disclose protected information to third parties.  But Plaintiff did not address the claim for promissory estoppel in his Opposition, as discussed above at note 5.  In any event, where the rights and obligations of the parties are set forth in a written agreement, the equitable doctrine of promissory estoppel is unavailable. *See Gallant v. Toledo Pub. Sch.*, 84 Ohio App. 3d 378, 386 (1992) (existence of written contract renders promissory estoppel inapplicable).  Because the claims of promissory estoppel and breach of contract each cover identical facts and seek the same recovery, this claim is also dismissed.

but instead he failed to enroll in coursework for more than two academic semesters which resulted in his removal pursuant to the University's Graduate Student Handbook (pp. 3-4). Plaintiff offers no specifics for his claim but merely concludes he was removed without notice and hearing in violation of the Fourteenth Amendment. Neither the Student Handbook nor other University policy is cited as support. There is simply no record basis for Plaintiff's removal claim.

### *Disclosure of Degree and Dissertation Progress to Third Party*

Plaintiff alleges Defendant breached the terms of the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and Defendant's Student Handbook (pp. 16-18), by releasing his degree status information to NMU. While Plaintiff cannot assert a private cause of action under FERPA, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002), his claim is based on a breach of contract. And Defendant admits this disclosure was improper under its own policy. Doll, who released the information to NMU over the telephone, should have limited his comments to whether the student was enrolled in the graduate college. Nonetheless, Defendant argues it is still entitled to summary judgment because Doll's action is not attributable to the University under agency principles, or, alternatively, Plaintiff cannot establish the disclosure resulted in damages.

Under Ohio agency law, a principal is liable for its agent's actions if it held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and the person dealing with the agent knew of the facts and acting in good faith had reason to believe and did believe that the agent had the necessary authority. *Master Consol. Corp. v. Banc-Ohio Nat'l Bank*, 61 Ohio St. 3d 570, 576-77 (1991).

13

Defendant argues Doll lacked the authority to violate its internal policy or FERPA[7] by releasing

protected information and it did not permit him to act as if he had authority to violate the provision.

However, under the apparent agency theory, a principal may be liable for unauthorized acts.  *See*

*Anderson v. Internat'l Union*, 150 F.3d 590, 593 (6th Cir. 1998); Restatement (Third) of Agency §

2.03 (private instructions to agent not to perform an action do not remove apparent authority).

Further, the "act" in question is responding to the inquiry, not violating FERPA, and Defendant does

not argue Doll was prohibited from responding to such inquiries.  Therefore, Doll's disclosure was

made as an agent of the University.

Defendant next claims Plaintiff cannot establish he was damaged as a result of the breach of

contract.  Under Ohio law, an action for breach of contract is intended to place the plaintiff in the

same position he would have been in but for the breach.  *Garofalo v. Chicago Title Ins. Co.*, 104 Ohio

App. 3d 95, 108 (1995) ("Upon demonstration of breach of contract, damages should place the injured

party in as good a position as it would have been absent the breach.").

Defendant argues any economic harm Plaintiff suffered was caused by NMU's dissatisfaction

with his teaching performance and lack of progress toward his degree at the University of Toledo.

This conclusion is supported by NMU's committee evaluation of Plaintiff's performance and

---

[7]

Plaintiff presumably refers to this subsection of FERPA: "No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records other than directory information . . . ." 20 U.S.C. § 1232g(b)(2).  FERPA defines "directory information" as "name, address, telephone listing, date and place of birth, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, degrees and awards received, and the most recent previous educational agency or institution attended by the student." *Id.* § 1232g(a)(5)(A). Defendant's Student Handbook (p. 17) permits release of "Directory information," defined largely in the same manner as in FERPA.

recommendation to terminate his position (NMU Ex. 24), which details NMU's dissatisfaction with Plaintiff's teaching performance, as well as student complaints (NMU Ex. 19 at pp. 72-97).

If NMU had required Plaintiff to provide evidence of his progress, the same information disclosed by Doll would have been available.  Plaintiff himself set in motion the events that led to his termination by initially misrepresenting his Ph.D. progress and then maintaining the deception throughout his tenure at NMU.  Doll's disclosure did not proximately cause Plaintiff's problems; Plaintiff's conduct (or misconduct) did.  Plaintiff's attempt to shift blame for his termination fails.

## 2.    Failure to Accommodate and Discrimination Based on Disability

Plaintiff next alleges Defendant violated state and federal anti-discrimination laws by (1) failing to provide reasonable accommodations for the comprehensive exam; and (2) retaliating against Plaintiff for filing internal and external complaints by removing him from the program and releasing his protected degree status and progress information to NMU.  The retaliation claim is discussed below. This Court recognizes that the Ohio anti-discrimination statute, Ohio Revised Code § 4112, has been interpreted by Ohio courts to be consistent with the ADA/Rehabilitation Act.  *See Kaltenberger v. Ohio Coll. Of Podiatric Med.*, 162 F.3d 432, 435 (6th Cir. 1998); *see also City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St. 3d 569, 573 (1998) ("We can look to regulations and cases interpreting the [ADA] for guidance in our interpretation of Ohio law."); *Ohio Civ. Rights Com'n. v. Case W. Reserve Univ.*, 76 Ohio St.3d 168, 175 (1996) ("In the past, we have looked to federal law to support a finding of discrimination under [Ohio Revised Code] Chapter 4112."); *McCafferty v. Cleveland Bd. of Educ.*, 133 Ohio App.3d 692, 703 (1999) ("It is settled that Ohio courts look to federal law to support a finding of discrimination under [Ohio Revised Code] Chapter 4112.").  Therefore, the Ohio claim can be considered along with the federal claims.

15

Defendant argues Plaintiff cannot establish a *prima facie* case under any of the relevant statutes because (1) Plaintiff did not make sufficiently specific requests for accommodations prior to the April 2001 exam, the only exam for which he actually sat; and (2) Defendant offered reasonable accommodations for all future exams.

### The 2001 Examination

Defendant argues Plaintiff's in-take meeting with Arbogast in the Office of Accessibility did not constitute a specific request for accommodations for the comprehensive exam.  Plaintiff argues this meeting as well as a later meeting with Arbogast were sufficient.

*Kaltenberger* is instructive.  In that case, the student had not even been diagnosed with a learning disability prior to taking an exam that she failed and later wished to retake in a remedial setting. The case stands for the proposition that a plaintiff must make a specific request for accommodations.  *Id.* at 437 ("[T]he College was not obligated to provide accommodation until plaintiff had provided a proper diagnosis of ADHD and requested specific accommodation.").  The cases cited by Plaintiff do not impose a duty of engaging in an interactive process with the student, unlike what is required under ADA Title I in the employment context, as acknowledged by Plaintiff in his Opposition (Opp. at p. 18 n.57).

In the present case, the Team Meeting form completed by the Office of Accessibility at the time of Plaintiff's in-take assessment, did not show a request for "adaptive technology" under "testing procedures," but did note "adaptive technology" was needed for general purposes (Frank Dep. Ex. D). Arbogast's testimony confirms that Plaintiff had not requested test-specific accommodations but rather indicated he would deal with such accommodations later (Arbogast Dep. pp. 36-37, 40-42). Further, the University Student Handbook advises students they must complete a "Request for

16

Services" form to receive accommodations (Pl. Ex. 21 at p. 6), which Plaintiff did not do before the April 2001 exam. This meeting, therefore, did not constitute a specific request for testing accommodations, but rather a general assessment of needs.

Plaintiff states (Frank Dep. pp. 14-15) that he visited Arbogast again before the April 2001 exam to request "reasonable accommodations" for the exam. Arbogast does not recall such a conversation (Arbogast Dep. p. 46), but the Court interprets the conflicting evidence in the light most favorable to Plaintiff, the non-moving party. Even assuming the meeting occurred, Plaintiff testified in his deposition that he did not specify what accommodations he wanted in these conversations (Frank Dep. p. 14). Moreover, Plaintiff made no complaint about the lack of accommodations until **after** the exam results were communicated to him. He did not protest before starting or during the exam, or as he left the exam room. Therefore, Plaintiff has failed to establish a genuine issue of material fact that he made a specific request for accommodations prior to the April 2001 exam.

### *Subsequent Examinations*

Following the April 2001 exam, the parties discussed at various times possible accommodations for future exams (May 2002, January 2003, January 2004). Plaintiff chose not to take any of these exams, claiming Defendant offered insufficient accommodations. For example, before the May 2002 exam, e-mail correspondence between Plaintiff and Doll show Plaintiff was focused on re-grading or re-taking the first exam with accommodations, and he did not sit for the next exam.

Before the January 2003 exam, Defendant offered: an external keyboard; neutral proctor; double time; voice recognition software; use of Plaintiff's own laptop. Plaintiff claims each of these was "systematically removed" by Defendant except for double time. Defendant's Academic

17

Committee's own report (p. 5) notes the reluctance of Doll to offer accommodations for this exam until the Office of Accessibility stepped in. Nevertheless, Defendant eventually did offer accommodations, and yet Plaintiff found them inadequate. Plaintiff's claim that Defendant "systematically removed" the agreed accommodations is without record support. On the contrary, Plaintiff himself refused the use of a scribe and refused the help of the IT staff to run Plaintiff's computer software to ensure that access to prohibited materials was blocked. When Plaintiff did ship his personal laptop to Defendant's IT department, it was after the date specified. The exam was set for January 2 and the computer arrived on December 30 with a cracked screen and without a power adapter. Defendant then offered to provide another laptop for Plaintiff's use in the exam, though it may not have offered the adaptive technology Plaintiff wished to use. Defendant made reasonable efforts to accommodate Plaintiff's disability and to provide alternatives.

Plaintiff claims he was not allowed to use his personal laptop and voice recognition software for the exam in January 2004. But Plaintiff again failed to submit his computer for inspection before that exam. Arbogast noted her efforts to contact Plaintiff to work out details for taking the exam, but Plaintiff preferred to wait for the outcome of his discrimination claim with the Ohio Civil Rights Commission (Arbogast Dep. Ex. 14-17). Plaintiff does not dispute this testimony or otherwise indicate he took the necessary steps to sit for the exam in either December 2003 or January 2004. Indeed, Defendant notes Plaintiff did not fill out the required form requesting accommodations for the exam (Arbogast Dep. Ex. 15).

The ADA requires only "reasonable" accommodations and does not require covered entities to restructure their programs in whole to accommodate disabled individuals. It is clear that Defendant

18

attempted repeatedly to provide accommodations to satisfy Plaintiff's needs and the Court finds these attempts reasonable as they were designed to allow him to successfully compete with other students.

> ### 3. Retaliation Under State Law and the ADA Through Disclosure of Degree Progress to NMU and Through Unequal Treatment of Plaintiff Compared to Others

Plaintiff claims Defendant unlawfully retaliated against him by revealing his private information to NMU.

To prove unlawful retaliation, Plaintiff must show: (1) he engaged in protected conduct; (2) he suffered adverse action; and (3) there is a causal connection. *Sullivan v. River Valley School Dist.*, 197 F.3d 804, 814-15 (6th Cir.1999). To show a causal connection, Plaintiff must show evidence "sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Zanders v. National RR*, 898 F.2d 1127, 1135 (6th Cir. 1990). The Sixth Circuit has also adopted a "but-for" standard. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). ("[A] plaintiff must produce sufficient evidence from which an inference could be drawn that an adverse action would not have been taken had the plaintiff not filed a discrimination action.") Temporal proximity -- no bright-line rule, but usually less than six months -- may help establish causation but is not sufficient without other compelling evidence of causation. *Id.* at 567.

### *Revealing Private Information to NMU*

Defendant does not dispute the first element. While Defendant does not concede that it took adverse action, Defendant focuses on the causal connection, stating there is nothing beyond conjecture to show that Defendant took retaliatory actions against Plaintiff. Plaintiff filed a complaint (in November 2004) with the OCRC, well **after** the disclosure of information in the phone call between NMU and Doll (in February 2004).

19

Plaintiff argues that circumstantial evidence supports the causal connection -- Doll's knowledge of FERPA (Doll Dep. pp. 7-9), his discussion of the phone call with a FERPA officer (Doll Dep. pp. 190-91) and the fact that others at the University were aware of FERPA's requirements. Defendant disputes that Doll discussed the matter with a FERPA officer, but rather claims he discussed it generally with a colleague and only later learned that he incorrectly believed he could release degree status information (Doll Dep. pp. 188-92). Defendant also notes it did not initiate contact with NMU, but simply responded to a request for information without knowledge it would harm Plaintiff.

The disclosure occurred within six months of the first and second internal complaints, but the record discloses no "compelling evidence" of causation. At best, Plaintiff has shown a mistaken (but accurate) disclosure of whether a student was "ABD" or not "ABD." Even assuming this disclosure breached FERPA and internal policy, there is no factual or logical support whatsoever that Plaintiff's internal complaints caused this response. NMU contacted Defendant and only did so because Plaintiff himself refused to provide NMU with a truthful status of his progress. Defendant did not actively seek to release the information, nor did it release more than was required to respond to the specific inquiry. In short, Plaintiff has not shown compelling evidence that his "protected activity was the **likely reason** for the adverse action." *Zanders*, 898 F.2d at 1135; *see also Steiner v. Henderson*, 121 Fed. App. 622, 626-27 (6th Cir. 2005) (stating that temporal proximity alone is insufficient to show causation; evidence showing supervisor disliked plaintiff is not compelling).

20

4.        **Violation of Due Process**

Plaintiff alleges Defendant unlawfully deprived Plaintiff of substantive and procedural due process by terminating his enrollment without notice or hearing, by failing to appropriately investigate the grading of the April 2001 exam, by failing to appropriately investigate the failure to accommodate and by allowing disclosure of his degree status.[8]

To establish a *prima facie* case for violation of Title II, Plaintiff cannot assert independent violations of the Fourteenth Amendment that are not related to the provisions of the ADA.  Plaintiff does not allege in the Complaint or in his Opposition how these constitutional violations also violate Title II.  Nowhere does Plaintiff offer evidence of causation.

Title II specifically prohibits exclusion or denial from services "by reason of such disability." One court of appeals has construed this language to require some evidence of causation, even if disability was only one of multiple causes.  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 277- 79 (2d Cir. 2003) (ADA plaintiff must show that her exclusion from benefits occurred "by reason of such disability" by demonstrating that disability was a "substantial cause" of the exclusion); *see also Andrews v. State of Ohio*, 104 F.3d 803, 807 (6th Cir.1997) (plaintiffs "must allege either that they are or are perceived to be handicapped within the definitions of each of the acts, that they are otherwise qualified for the job, **and that they were discriminated against on the basis of their disability**.") (emphasis added).

---

[8] Plaintiff's allegations of Fourteenth Amendment substantive and procedural due process violations are asserted under the Title II Violation Count because this Court dismissed the Section 1983 claims against Defendant. With the Court's permission, Plaintiff transferred the factual allegations to this Count (Doc. No. 41). Therefore, the claim is one under Title II of the ADA and not directly under the Fourteenth Amendment.

For reasons discussed above, Plaintiff has failed to present sufficient evidence to warrant a reasonable trier of fact to find in his favor on this claim.

### 5. Breach of Contract in the Grading and Re-Grading of Plaintiff's April 2001 Examination

Plaintiff alleges Defendant breached its written policies governing grading of comprehensive exams and therefore is liable for breach of contract.  In the area of academic affairs, courts must defer to professional academic judgments unless there is evidence that there was no purpose other than denying education to a disabled student.  *Ohio Civil Rights Comm'n v. Case Western*, 76 Ohio St. 3d 168, 179 (1996) ("Courts are particularly ill-equipped to evaluate academic requirements of educational institutions.  As a result, considerable judicial deference must be paid to academic decisions made by the institution itself unless it is shown that the standards serve no purpose other than to deny an education to the handicapped.") (citations omitted).  The standard of review for a court is whether the institution failed to exercise professional judgment at all or, alternatively, whether it acted in an arbitrary and capricious manner.  *Bleicher*, 78 Ohio App. 3d at 308. (Courts are "required to defer to academic decisions of the college unless it perceived such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.  The standard of review is not merely whether the court would have decided the matter differently but, rather, whether the faculty action was arbitrary and capricious.") (citing *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985); *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 91 (1978)).

### *Defendant's Grading of the April 2001 Examination*

Plaintiff claims he passed the exam because two members of the exam committee, Dr. Bhatt and Dr. Lim, graded his exam as passing.  Defendant counters that the exam committee determined

that Plaintiff had failed.  Plaintiff does not dispute this conclusion, and it is the committee's collective grade that counts.  Most significantly, Plaintiff has not shown that the committee failed to exercise its professional academic judgment in grading the exam.

Next, Plaintiff claims Defendant did not follow its Handbook policies in grading the exam. Specifically, he argues the committee did not produce a majority vote as required in the Handbook (p. 10).  Defendant argues this language simply meant a vote of the majority of those present (quorum) to discuss the exam, not the entire committee.  Plaintiff also cites the lack of a written memo to the program director, but this requirement was not mandatory and, at any rate, the committee chair and program director were the same person in this case (Doll Dep. pp. 39-41).  Finally, Plaintiff cites the loss of the original hard copy of the exam, but points to no requirement for retaining it.

Even assuming the laundry list of misdeeds, Plaintiff has not demonstrated arbitrary and capricious action.  The undisputed facts demonstrate the exam committee reviewed Plaintiff's exam and members submitted grades based on their academic judgment.  Plaintiff has pointed to no facts demonstrating a lack of professional judgment or failure to engage in a reasoned process in reviewing his exam.

### Defendant's Re-Grading of the April 2001 Examination

Plaintiff argues a re-grading panel that reviewed his exam in 2004 (1) used an exam that was altered from its original format (formatting anomalies possibly attributable to problems with the Word document), and (2) used an improper standard in evaluating the exam, namely by finding his exam did not "rise to the level" of the other exams.

Regarding the alteration, Defendant argues it was not required to retain hard copies of the original exams.  Plaintiff claims the document produced during discovery was not what he originally

23

submitted, but it is not clear to this Court what injury Plaintiff claims. The re-grading panel could only work with what was available. Plaintiff cites no evidence in the record that Defendant intentionally altered the exam or that the absence of exam answers led to the failing grade.

The re-grading arose following Plaintiff's second internal written complaint[9] with the University, which he filed in November 2003. The Graduate School referred the investigation to the Academic Standing Committee ("ASC"), which conducted a hearing with Plaintiff present and examined the background of the exams. In May 2004, the ASC issued its findings, including: that although Plaintiff strongly perceived discrimination in the grading and accommodations for future exams, there was no evidence that Doll discriminated against Plaintiff or that Plaintiff requested accommodations prior to the April 2001 exam. The ASC recommended that a panel of four faculty members regrade the exam, comparing them to exams deemed passing (Frank Dep. Ex. Q).

In September 2004, the panel determined Plaintiff's 2001 exam "did not rise to the level of the comparison exam" (Abraham Dep. Ex. 28). Abraham, Dean of the Graduate School, notified Plaintiff of the panel's decision and that he could re-take the exam two more times with proper accommodations (Abraham Dep. Ex. 29). Plaintiff cites the panel's failure to state specifically "fail" or "pass" as the ASC report had directed. Whatever words the committee used or failed to use, its

---

[9] Plaintiff first lodged an internal complaint with the College of Business in August 2003, alleging (1) Doll was withholding his grade in a course; (2) the grading process for the comprehensive exam was unfair because he had been informed by some faculty his answers were superior to others'; (3) he was denied accommodations for the April 2001 exam and discriminated against by Doll; and (4) he encountered resistance and problems in receiving accommodations for future administrations of the exam. In October 2003, Defendant addressed these complaints by ensuring Plaintiff's grade in Doll's course was released. Regarding the exam, Defendant concluded (1) Plaintiff had not properly requested accommodations for the 2001 exam; (2) that one or two graders deemed Plaintiff's exam satisfactory did not undermine the validity of the exam committee's decision; (3) that Doll and Arbogast worked diligently to try to provide reasonable accommodations for future exams; (4) that allowing others to use external keyboards did not undercut the accommodations for Plaintiff because he was still afforded additional time; (5) Plaintiff would not have been confined to the classroom during the exam -- he would have been allowed restroom breaks (Frank Dep. Ex. M)

report made clear Plaintiff had failed.  There is no showing to suggest a lack of professional judgment or an arbitrary and capricious basis for the grading or regrading of Plaintiff's exam.

**VII.    CONCLUSION**

Plaintiff, despite his multi-pronged attack, fails to create a genuine issue of material fact. Plaintiff rejected Defendant's numerous offers to allow Plaintiff to retake the exam with accommodations, instead insisting on being given a passing grade on an exam he failed -- verified by a second panel of graders.  His belated protests of lack of accommodations cannot excuse his failure to satisfy the legal requirements of a *prima facie* case in order to send this case to a jury.

For the foregoing reasons, this Court grants Defendant's Motion for Summary Judgment.

IT IS SO ORDERED.

                              *s/ Jack Zouhary*
                              JACK ZOUHARY
                              U. S. DISTRICT JUDGE

                              December 28, 2007